UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| RODNEY JENNINGS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 1:19-CV-00360-JRG-CHS |
| | ) | |
| TONY MAYS,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION</u>

One evening after Petitioner went to the residence of Cheslei Thompson, the mother of his children, to try to see his children, Petitioner and Ms. Thompson had a verbal dispute and Petitioner then shot Raphael White ("the victim"), as Petitioner was leaving the residence. *State v. Jennings*, No. E2017-00330-CCA-R3-CD, 2018 WL 1168723, at *1–5 (Tenn. Crim. App. March 6, 2018), *perm. app. denied* (Tenn. June 6, 2018) ("*Jennings I*"). A Hamilton County jury convicted Petitioner of second-degree murder based on this incident. *Id.* at *1. Petitioner, a state prisoner, filed a pro se petition for habeas corpus relief under 28 U.S.C. § 2254 challenging this conviction by asserting that the evidence was insufficient to support it, the prosecution wrongly questioned him about his invocation of his Fifth Amendment right to remain silent at trial, and his counsel provided ineffective assistance at trial in various ways [Doc. 1], that is now before the Court.[2] Respondent filed a response in opposition to the petition [Doc. 8] and the state court record [Docs. 6, 10].

---

[1] The Court takes judicial notice that Tony Mays is the current Warden of Riverbend Maximum Security Institution, which is where Petitioner is incarcerated [Doc. 26 at 2]. https://www.tn.gov/correction/sp/state-prison-list/riverbend-maximum-security-institution.html (last visited September 15, 2022). Thus, he is the proper Respondent herein. Rule 2(a) of the Rules Governing 2254 Cases.

[2] Petitioner also filed a motion for summary judgment [Doc. 13] and a motion regarding amendment of his petition [Doc. 23], both of which the Court denied [Docs. 15, 25].

1

After reviewing the parties' filings and the state court record, the Court finds that Petitioner is not entitled to relief under § 2254, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), and the habeas corpus petition will be **DENIED**.  Accordingly, this action will be **DISMISSED**.

## I.    BACKGROUND

Petitioner appealed his second-degree murder conviction to the Tennessee Court of Criminal Appeals ("TCCA"), which described the evidence from Petitioner's trial, including an evidentiary hearing regarding admission of evidence under Rule 404(b) of the Tennessee Rules of Evidence during the trial, as follows:

### A.  404(b) Hearing

The State sought to introduce proof of a June 2013 domestic assault conviction, involving Ms. Thompson and [Petitioner]'s children.  The State submitted that the evidence was relevant to show [Petitioner]'s intent related to the second degree murder charge, demonstrating similarities between the 2013 episode and the 2014 shooting.  The State, through Jean Rogers, a Hamilton County 911 Record Specialist, introduced two 911 calls made from a neighbor's residence recorded at 1:11 a.m. on June 5, 2013.  The defense, through the same witness, introduced two 911 calls placed from Waffle House on East 23rd Street.  These calls were made by a man who identified himself as "Rodney" at 4:22 a.m. and 5:02 a.m. on June 5, 2013.

Brian Angel, a Chattanooga Police Department officer, testified that, in June 2013, he was dispatched to a residence on 6th Avenue in Chattanooga, Tennessee, at approximately 1:30 a.m.  When he arrived, he observed a female, Ms. Thompson, outside who appeared "very hysterical."  There was blood "all over her," and he noticed a broken window on the front of the apartment.  Ms. Thompson explained to the officer that her "child's father," later identified as [Petitioner], had broken the window and there was "some kind of struggle" during which she was cut on the broken glass.  [Petitioner] made entry but fled prior to the officer's arrival. Officer Angel testified that Ms. Thompson had cuts on her forearms.  He also observed two small children inside the residence.

Officer Angel testified that, within a couple hours of his initial contact with Ms. Thompson, [Petitioner] arranged to turn himself in to the police at a Waffle House parking lot located on 23rd Street.  On cross-examination, Officer Angel was asked

about whether there was "a lot of gang activity" in the 6th Avenue apartment complex, and he replied, "Sure."

Ms. Thompson testified that she and [Petitioner] had been in a relationship and had two children together. The couple had never married but had lived together intermittently. Ms. Thompson explained that [Petitioner] lived with her at the 6th Avenue residence for "a couple of months" before he moved out due to an argument. In June 2013, after [Petitioner] had moved out, he returned to "visit." During the visit, a Chattanooga Housing Authority employee appeared at the residence and issued [Petitioner] a citation for "yelling in [Ms. Thompson's] face" and banned [Petitioner] from the property.

Ms. Thompson testified that several days later, on June 5, 2013, a friend of hers was spending the night. She recalled that Kionna Glenn and Ms. Thompson's two children were at the residence that night when [Petitioner] came to the door. Ms. Glenn let [Petitioner] inside and, once inside, he instigated an argument with Ms. Thompson. [Petitioner] and Ms. Thompson were in an upstairs bedroom with their children, and [Petitioner] accused Ms. Thompson of engaging in a sexual relationship with Kionna. The argument escalated to an assault during which [Petitioner] hit and pushed Ms. Thompson. The [Petitioner] and Ms. Thompson moved their altercation downstairs where [Petitioner] hit Kionna. The children began crying, and [Petitioner] grabbed their older son, then four years old, and pushed him against the wall. "[F]inally" [Petitioner] exited out the front door.

Ms. Thompson testified that [Petitioner] could not re-enter the residence because she quickly locked the front and back door after his departure. Because he was unable to enter through a door, [Petitioner] broke the kitchen window. As [Petitioner] entered through the window, Ms. Thompson tried to push him back out, cutting her hands and arms on the broken glass in the process. [Petitioner] entered through the window and hit Ms. Thompson in the kitchen before walking to the living room area where he paced. According to Ms. Thompson, [Petitioner] dropped his phone, told Ms. Thompson to call the police, and then left. Ms. Thompson used [Petitioner]'s cell phone to call the police. Ms. Thompson was transported by ambulance to the hospital where she was treated for her injuries. [Petitioner] was later arrested and served six months in jail for this incident.

Ms. Thompson testified that [Petitioner] was released from jail in December 2013. He contacted her approximately two weeks after his release via Facebook to ask if he could see the children. Ms. Thompson agreed, and [Petitioner] picked up the children at Ms. Thompson's mother's residence. Later that night, Ms. Thompson retrieved the children from [Petitioner]. Approximately two weeks before the shooting in this case, she again allowed [Petitioner] to take the children for a few hours. [Petitioner] picked up the children from her 6th Avenue residence and returned them there.

On January 28, 2014, [Petitioner] appeared at her front door asking to see the children. The older child was at Ms. Thompson's mother's residence, and the two-year-old was upstairs sleeping. Ms. Thompson explained this to [Petitioner] and told him she would not wake up their younger child. She told him he should come back another time. [Petitioner] continued asking to see the sleeping child. Raphael White, the victim, told [Petitioner] "we don't want any problems," and [Petitioner] "said the same." [Petitioner] backed out the door, put his hand into his pocket when he was out in the hall. As the victim was shutting the door, Ms. Thompson heard a gunshot. Ms. Thompson testified that the victim did not have a gun and that she did not see the gun that shot the victim. After shooting the victim, [Petitioner] fled.

On cross-examination, Ms. Thompson testified that on the night of the June 2013 assault [Petitioner] was "out of control," but on the night of the January 28, 2014 shooting [Petitioner] was calm and there was no "fight."

After hearing this evidence, the trial court granted [Petitioner]'s motion seeking to exclude any testimony about the June 2013 domestic assault. In further discussions about potential testimony, the trial court advised defense counsel that, if the defense "open[ed] the door to the [2013] domestic assault, the rest of it comes in."

## B. Trial Testimony

During the trial, the parties presented the following evidence: Larry Ellis and Matthew Bond, Chattanooga Police Department ("CPD") officers, were the first responders to a homicide scene located at East Lake Court housing project on 6th Avenue. As Officer Ellis approached the entryway to the unit, he saw the victim lying on the floor near the door, and three females and one male who were "very emotional and screaming." The officers separated the witnesses from the victim by moving the witnesses into the living room area. The officers also conducted a protective sweep of the unit and other than the previously mentioned adults and one child, found no one else present. Officer Ellis testified that the witnesses identified the shooter and described the truck that he left in. The victim was transported to the hospital, and the witnesses were transported to the police station for questioning.

James Metcalfe, the Hamilton County Chief Medical Examiner and Forensic Pathologist, testified as an expert witness in the field of forensic pathology. After examining the victim's body, Dr. Metcalfe concluded that the victim's manner of death was homicide and that the cause of death was a gunshot wound to the chest. Dr. Metcalfe explained that the "main injury" was caused by a bullet that traveled through the victim's left ventricle and left lung. He stated that this type of wound was fatal. Dr. Metcalfe collected the bullet from the victim's back just under the skin. The Chattanooga Police Department collected the bullet as part of the investigation.

4

Tirrea Tony testified that she was present in Ms. Thompson's apartment ("6th Avenue unit") at the time of the shooting. She said she was in the living room when [Petitioner] knocked on the door. Ms. Thompson opened the door to him, and the two argued in the kitchen about [Petitioner] seeing the children. Ms. Tony recalled that the younger child was asleep in the apartment, but the older child was not there. According to Ms. Tony, Ms. Thompson told [Petitioner] he should leave. The victim came into the kitchen and reiterated that [Petitioner] needed to leave, saying "I don't want no problems." [Petitioner] responded that he did not want "no problems" either and walked out the door. The victim walked to the door to shut it, and [Petitioner] shot the victim in the chest. Ms. Tony testified that she did not see the victim with any weapon that night and did not hear him threaten [Petitioner].

On cross-examination, Ms. Tony confirmed that [Petitioner] was "aggressive" toward Richard Morris at Ms. Thompson's residence on the day of the shooting. When presented with her testimony from the preliminary hearing, Ms. Tony agreed that at the preliminary hearing she said that [Petitioner] showed no signs of aggression but maintained that her trial testimony was more accurate. Ms. Tony reiterated that [Petitioner] and Ms. Thompson were in the kitchen where he was talking like he was "mad at her" when the victim entered and told [Petitioner] to leave. Ms. Tony said [Petitioner] was pacing back and forth at the time and then walked out the door into the "public hall." Ms. Tony confirmed that she did not see the gun or the gunfire.

Ms. Tony testified that, at the time of the shooting, the victim had "[h]is flag" in his pocket and his cell phone. After playing the 911 recording again, Ms. Tony agreed that she did not tell the 911 operator, when asked, who shot the victim and that she also denied knowing where the victim was shot. Ms. Tony, however, maintained that she was certain it was [Petitioner] who shot the victim.

On redirect examination, Ms. Tony testified that she knew [Petitioner] as "Roscoe" and was unaware of his full name on the day of the shooting. She identified [Petitioner] in court as the man who shot the victim on January 28, 2014.

Ronald White testified that Ms. Thompson was his sister and that the victim was his cousin. Mr. White recalled that he had stayed at his sister's residence the night of January 27, 2014, and was still there on January 28 when [Petitioner] came by asking to see his children. [Petitioner] knocked on the door, and Ms. Tony called upstairs to Ms. Thompson, who was in her bedroom with a "male friend . . . [Richard Morris]." Ms. Thompson went downstairs and opened the door to [Petitioner]. The victim knocked on the door of the room Mr. White was in and "told him to come down the steps" with the victim. The victim and Mr. White went downstairs and into the living room.

Mr. White testified that he overheard [Petitioner] and Ms. Thompson talking about their children. At some point, Mr. Morris came downstairs, and [Petitioner] asked Mr. Morris if he "was [ ] messing with [Ms. Thompson] now." Mr. Morris denied

"messing with" Ms. Thompson, stating that she was "[j]ust [his] home girl." [Petitioner] told Mr. Morris that he had "no problem" with him, Mr. Morris left, and [Petitioner] and Ms. Thompson resumed their conversation about their children. The conversation between the two turned "loud," and Mr. White urged [Petitioner] and Ms. Thompson to "calm down" for the sake of their children.

Mr. White testified that the conversation between [Petitioner] and Ms. Thompson again escalated, so the victim walked into the room, opened the door for [Petitioner], and said, "we don't want no problems." [Petitioner] said that he did not want "no problems either" and then the shooting occurred. Mr. White said he was standing behind the victim and did not see [Petitioner] fire the gun but noted that [Petitioner] was the only person standing in the doorway. After the gunfire, the victim fell backward toward Mr. White, and Mr. White "pulled him in." Mr. White said that the victim grabbed his chest and was shaking. When Mr. White lifted the victim's shirt, he saw the gunshot wound and immediately ordered the others to call 911. He said that everyone was in shock and "flipping out," so he grabbed a phone and called 911.

Mr. White testified that, before the shooting, the victim did not threaten [Petitioner] or make any threatening gestures toward [Petitioner]. He said that the victim was closing the door when [Petitioner] shot him.

On cross-examination, Mr. White said that he used the victim's cell phone to call 911 and that he retrieved the cell phone from the counter. Upon review of the transcript from the preliminary hearing, Mr. White agreed that he had previously testified that the cell phone had been in the victim's pocket but that someone had handed it to him to call 911. Mr. White explained that the circumstances were very stressful, and he was unsure of whose phone he had used to place the 911 call. Mr. White stated that the victim's "child mother" retrieved the victim's phone several days after the shooting. Mr. White confirmed that in November 2009, he was convicted of burglary and theft.

Ms. Thompson testified that in January 2014 she lived in the 6th Avenue unit with her two children, who were two and four years old at the time. Ms. Thompson explained that the victim was her cousin and Mr. White was her brother.

Ms. Thompson testified that she and [Petitioner] had been in a relationship for six years and, at one point, [Petitioner] had lived in the 6th Avenue unit with her but had moved out in June 2013. In the late afternoon of January 28, 2014, Ronald White, Raphael White, Ms. Tony, Mr. Morris, and "Lanesha" were present at the apartment. [Petitioner] came to the residence to "chill." She recalled that Ms. Tony heard the knock at the door and yelled upstairs to Ms. Thompson that [Petitioner] was at the door. Ms. Thompson was in her upstairs bedroom with her youngest son and Mr. Morris.

Ms. Thompson testified that she went downstairs and opened the door for [Petitioner]. Around that time, Mr. Morris was leaving. [Petitioner] and Mr. Morris exchanged a few pleasantries and then Mr. Morris left. [Petitioner] asked to see their youngest child, and Ms. Thompson explained that he was sleeping. [Petitioner] urged Ms. Thompson to go and wake the child so he could see him, but Ms. Thompson declined, suggesting [Petitioner] come over to see their children another time. [Petitioner] asked Ms. Thompson for a cigarette, and she told him she did not have any. She continued to encourage him to leave, acknowledging that as she did so, she became "kind of loud." The victim then approached [Petitioner] saying "we don't want no problems," and [Petitioner] reiterated the same and began walking toward the door with his "hands up." As he walked out the door, he put his hand back in his pocket. The victim took hold of the door to shut it, and then Ms. Thompson heard gunfire. Ms. Thompson said that she did not see the gun but that [Petitioner] was the only person in the public hallway. After the gunfire, [Petitioner] took off running. Initially, she did not realize that the victim had been shot, but when the victim's shirt was lifted, she saw a gunshot wound.

Ms. Thompson testified that while Mr. White and Ms. Tony called 911, she checked to see if the victim had a pulse. Police officers arrived first, followed by the ambulance that transported the victim to the hospital. Everyone else in the residence was taken to the police station. Ms. Thompson stated that, before the shooting, she did not hear the victim threaten [Petitioner] nor did the victim have a gun on his person.

Caleb Brooks, a CPD crime scene investigator, testified that on January 28, 2014, he responded to Erlanger Hospital about a potential homicide. Once he arrived, he learned that the victim had died. Officer Brooks collected evidence and then proceeded to the crime scene. At the crime scene, Officer Brooks took photographs and then placed evidence markers where there were items to be collected and video-recorded the scene. Officer Brooks observed what appeared to be a blood stain on a window seal [sic] and on the porch. He collected samples of both substances and swabbed the door handle for DNA testing. Officer Brooks stated that he and another officer searched the residence and found no firearms.

Steve Scott, a Tennessee Bureau of Investigation ("TBI") forensic scientist, testified as an expert witness in firearms identification. Special Agent Scott stated that he had received a bullet for forensic examination. His examination revealed characteristics consistent with Winchester brand ammunition and generally associated with a .38 or .357 caliber bullet. Special Agent Scott stated that "typically" a .38 Special caliber revolver left residue within a four to five foot range from the muzzle of the gun. Nonetheless, he stated that if he did not find any residue, he could not "really form an opinion."

Kendall Stoner, a TBI forensic scientist, testified as an expert witness in forensic biology, specifically DNA testing. Special Agent Stoner tested potential blood samples taken from the front porch of the building and from the window seal [sic].

Both swabs tested negative for the presence of blood. She also tested a swab for "touch DNA" taken from the interior door handle of the "main entrance door." The results did not indicate the presence of human DNA. The results from a swab of the front exterior door handle did not reveal a DNA profile.

Tim Pickard, a Chattanooga Police Department officer, testified that he was assigned to the fugitive unit and became involved in this case in February 2014 after other officers were unable to locate [Petitioner]. Officer Pickard said that typically, members of the unit will conduct interviews with relatives, close family members, or other people associated with a suspect in order to gain information on the suspect's location. After investigating numerous possible connections to [Petitioner], the fugitive unit obtained information that [Petitioner] was no longer in the Chattanooga area. Information about [Petitioner] was provided to the U.S. Marshals and subsequently Officer Pickard learned that [Petitioner] was found and arrested in Memphis, Tennessee on March 17, 2014.

James Plumlee, a CPD homicide detective, testified that, on January 28, 2014, he arrived at the crime scene at approximately 8:30 p.m. All potential witnesses had been transported to the police station for questioning, and the crime scene area had been "taped off" to protect any potential evidence. Detective Plumlee conducted the recorded interviews with Ms. Tony and Ms. Thompson. After officers had interviewed all the witnesses, they met to share the information learned and developed [Petitioner] as a suspect. The police department issued a "Be On The Lookout" ("BOLO") for [Petitioner]. Further, patrol officers were sent to addresses of some of [Petitioner]'s relatives in an attempt to locate [Petitioner].

Detective Plumlee testified that he went to [Petitioner]'s father's residence and spoke with [Petitioner]'s father and searched the residence for [Petitioner]. [Petitioner]'s father said that [Petitioner] had contacted him from a blocked number and that he had tried to convince [Petitioner] to turn himself in and talk with the police. [Petitioner]'s father also disclosed that [Petitioner] "hangs out" with Prentice Barnette. Police followed this lead but were unable to locate [Petitioner]. On February 9, 2014, the police department issued a video about the homicide on Crime Stoppers. The police received tips about [Petitioner]'s possible location as a result of the video but still [Petitioner] was not located. In February, the search for [Petitioner] was transferred to the fugitive unit. In March, [Petitioner] was located in Memphis, Tennessee and transported to the Hamilton County jail. Detective Plumlee confirmed that the weapon used in the shooting was not recovered.

[Petitioner] testified that he had two children with Ms. Thompson. He said that he stood five feet three inches tall and weighed 138 pounds in January 2014. About visitation with his children, [Petitioner] said that, following the end of his romantic relationship with Ms. Thompson, on the day he wanted to see the children he would contact Ms. Thompson via Facebook or call Ms. Thompson's mother, Marylyn

8

Thompson.[3]  [Petitioner] stated that he was "homeless" but, when he had time with his children, he would go to a family member's or friend's house.  He usually had the children in six or seven hour increments and would make arrangements for "a ride" to return the children to Ms. Thompson at East Lake Courts.

[Petitioner] recalled the week before the shooting.  He said that he had picked up the children from Marylyn Thompson's house.  At the end of his time with the children, however, he could not obtain a ride to take the children home so he called Ms. Thompson asking if she would come get the children.  Ms. Thompson agreed, and [Petitioner] told her to meet him at "54th and St. Elmo Avenue" because he did not want the victim and Mr. White to know where he stayed.  Ms. Thompson arrived, with Mr. White driving, later than expected and appeared "all mad" and "agitated."  She rushed the children into the car and would not speak to [Petitioner].

[Petitioner] testified that he had known the victim and Mr. White for many years. He explained that the victim and [Petitioner]'s younger brother, Nathan Jennings, had gone to school together.  [Petitioner] recalled that approximately two years before the shooting, in 2012, [Petitioner] and the victim had engaged in an argument at Marylyn Thompson's residence.  [Petitioner] said that he had gone to Marylyn Thompson's residence to see Ms. Thompson.  While still outside, the victim approached [Petitioner] and accused him of "disrespecting Mar[y]lyn Thompson." The two began to argue and "tussle," but no one was hurt during the exchange.  He described the victim as six feet one inch tall and weighing approximately 175 pounds in comparison to [Petitioner]'s smaller stature.

[Petitioner] confirmed that he was convicted of robbery in 2006 and domestic violence and vandalism.  As to the latter two offenses, [Petitioner] explained that he was "staying with" Ms. Thompson at her 6th Avenue unit.  Ms. Thompson had a friend over at the time, and [Petitioner] wanted the friend, Kionna Glenn, to leave because he felt that Ms. Thompson "act[ed] funny toward[ ] [him]" in Ms. Glenn's presence.  Ms. Thompson refused to ask Ms. Glenn to leave, so [Petitioner] left to "drink" and "stuff like that."  When [Petitioner] returned, he again raised the issue of Ms. Glenn leaving, and Ms. Thompson "just went off."  The two began to argue and "stuff."  He felt badly about the exchange, so he left his cell phone with her to call the police and walked to Waffle House.

[Petitioner] testified that, while he was incarcerated for the domestic assault conviction, he spoke with his brother on the phone.  His brother told him to be careful because the victim had threatened to "get" [Petitioner] when he saw him next.  [Petitioner] and victim were incarcerated at the same facility for a period of time, and the victim confronted [Petitioner] verbally about the incident with Ms. Thompson but initiated no physical contact.  [Petitioner] avoided the victim after that.

---

[3] Like the TCCA, the Court will refer to this individual as "Marylyn Thompson" and to Cheslei Thompson as Ms. Thompson.  *Jennings I*, at *6 n.3 and 4.

9

[Petitioner] testified that he had seen the victim before with a gun at Marylyn Thompson's residence. He recalled that he was on the front porch of the residence when the victim arrived. The victim's eye was swollen and bleeding, and [Petitioner] saw a gun in the victim's back pocket as the victim paced back and forth angrily while ranting. [Petitioner] said that Mr. White prevented [Petitioner] from getting involved saying that his brother was "crazy."

[Petitioner] testified that on January 28, 2014, he was staying at a hotel on Broad Street. He contacted Marylyn Thompson to arrange to see his children. He was unable to contact Marylyn Thompson until 3:00 or 4:00 p.m. Marylyn Thompson told [Petitioner] that Ms. Thompson and the older child had gone home. At around 5:15 p.m. [Petitioner] rode with a friend, Prentice Barnette, to East Lake to try to see his children. [Petitioner] confirmed that the Chattanooga Housing Authority had placed him on a no trespass list for East Lake Courts but that he had told his oldest child that he would spend time with him that week, so he planned to pick up the children and leave.

[Petitioner] testified that Mr. Barnette dropped him off outside the 6th Avenue unit and left. He knocked on the door and Ms. Tony called out asking who it was and then told Ms. Thompson that [Petitioner] was at the door. He waited a few minutes, and then Ms. Thompson opened the door holding a "blunt in her hand." [Petitioner] asked to see the children, and Ms. Thompson said that their older son was at her mother's residence and their younger child was upstairs asleep. [Petitioner] said he did not believe her because he had just spoken with Marylyn Thompson who said that the children were at home. [Petitioner] offered to get the children "ready" if she would "go get them," and Ms. Thompson agreed. She stepped back inside, and [Petitioner] asked if he could wait inside due to the cold. Ms. Thompson agreed, and he stepped inside and closed the door before asking Ms. Thompson for a cigarette. Ms. Thompson stated she did not have one, and [Petitioner] walked into the kitchen area where he waited alone for about seven minutes.

[Petitioner] testified that the victim, Mr. White, and Ms. Thompson came down the stairs, and the victim walked down a "little hallway," making no eye contact with [Petitioner]. [Petitioner] observed a "black flag" hanging out of the victim's back pocket with a firearm. The victim walked out the door and shut it behind him. [Petitioner] explained that he became nervous as soon as he saw the victim. Ms. Thompson and Mr. White walked into the kitchen where [Petitioner] was waiting. Mr. White was holding a cell phone and "snickering" while looking at [Petitioner], and Ms. Thompson looked paranoid "like something was about to happen." Richard Morris then came downstairs and into the kitchen. [Petitioner] stated that he had been unaware that Mr. Morris was in the residence. [Petitioner] asked Mr. Morris if he was "over here with my baby mama," and Mr. Morris responded, "no, we cool." Mr. Morris walked over to Ms. Thompson, asked if she was okay, and then "hurried up and got up out of there like something bad was going to happen." About a minute later, the victim re-entered the apartment.

10

[Petitioner] testified that he, Ms. Thompson, Mr. White, and the victim were all in the kitchen within close proximity to one another. He testified about the interactions leading up to the shooting as follows:

> [The victim's] in my face like this. Just looking at me. So I was like all right, where [was my child] at. And my baby mamma looked at me and she was like, I don't know. Then I was like, all right. Before I leave why did you do the kids like that the other day. And when she came and got the kids she was being rough with them and hurried them up in the car. And the moment I said that [the victim] was like because I told her to. Ain't no mother f**kin 50th Street in St. Elmo. I was like it is a 50th Street in St. Elmo. You misunderstood what I said. But as I'm saying this I'm not looking at him. I'm looking at [Ms. Thompson]. You know what I'm saying, talking to [Ms. Thompson]. And I said—I put my hands up, I said look, I don't want no trouble. And when I said I don't want no trouble he said, well, if you don't want no problems it's going to be some problems and went to reach for his firearm and that's when I jumped out—before I did that I put my hands up, I put my hands in my pocket and he said well, you don't want no problems there's going to be some problems and when he went to reach for his firearm I jumped back out the way like towards the left because as he's saying I don't want no—as he's saying if you don't want no problems there's going to be some problems he moves from right there where he at to in front of me.
>
> [I thought] my life was fixin [sic] to end or I was going to get seriously injured. Because [the victim] is like way taller and bigger than me. And if he was to grab em it ain't nothing [sic] I can do with it.

[Petitioner] testified that when the victim reached for his firearm, "a .38 Special double action," he took a "quick side step to the left" and then took out his gun "all in one motion." [Petitioner] said he raised his hand up and then pulled the trigger. At the time [Petitioner] fired his gun, he estimated that he and the victim were about three or four feet apart. [Petitioner] admitted that he was not allowed to have a gun on Chattanooga Housing Authority property. [Petitioner] recalled that, after he fired his gun, the victim fell straight back on the ground and began "scooting" backward. He said that Ms. Thompson was standing behind the victim and that Mr. White was on his cell phone at the time. He said that he began to pace, considering whether he should offer help but felt that he would then have to "wrestle" with Mr. White. He believed it was safer to leave. As he left, he saw Ms. Tony standing at the end of the public hallway.

[Petitioner] testified that, following the shooting, he ran down to the parking lot and crossed 4th Avenue. At some point he threw the gun out because he was concerned

that if he encountered the police "they would deal with [him] violently." As he fled, he was in shock that he had shot someone because he had never "had to use that kind of force to defend." He was also concerned that the witnesses would lie about what had occurred because "they didn't like [him]." [Petitioner] ran to the Lookout Mountain Suites and smoked "marijuana to calm down." The following morning he left for Memphis. [Petitioner] stated he did not believe he had done anything "wrong," but he was afraid to contact the police because he did not know "who [he] could trust at the time."

[Petitioner] testified about the black bandana he had seen tied to the gun in the victim's pocket. He said a black bandana is the type of bandana worn by members of the Gangster Disciples, a gang "out of Chicago, Illinois." [Petitioner] described the presence of Gangster Disciples as "the deepest gang in Chattanooga as far as numbers." He said there were members in every area of the city. He said the bandanas are tied with "the knot part . . . on the gun." The black "flag" was tied in this manner on the victim's gun and, when [Petitioner] saw it, he believed it "mean[t] war time." When [Petitioner] saw the "black flag," he "began to fear for [his] life" and tried to determine how to escape safely. [Petitioner] explained that he fled to Memphis in an attempt to avoid gang retaliation against him and his family.

[Petitioner] testified that he felt "bad" about the shooting but, at the time, felt he had no other choice. He said if he had not shot the victim, he would have been killed.

On cross-examination, [Petitioner] agreed that in June 2013, he and Ms. Thompson argued and, after the argument, he was issued a no trespassing notification. Despite the notification, two days later he returned to the property heavily intoxicated. He engaged in another argument with Ms. Thompson and punched Ms. Thompson in the face one time. [Petitioner] denied breaking a window to try to re-enter Ms. Thompson's residence, and he denied shoving his son. [Petitioner] agreed that he pleaded guilty to domestic assault and vandalism for this incident, served six months in jail, and was released in December 2013. Two weeks after his release from jail, [Petitioner] contacted Ms. Thompson via Facebook and arranged to pick his children up at Ms. Thompson's residence. [Petitioner] agreed that both the victim and Mr. White were aware that [Petitioner] had "beaten up" Ms. Thompson and that "they didn't like that." [Petitioner] admitted that he shot and killed the victim but maintained that he did so in self-defense.

[Petitioner] testified that he purchased the gun he shot the victim with from a "junkie" three weeks after he was released from jail. He admitted that he was not allowed to carry a gun because he was a convicted felon. [Petitioner] agreed that when he went to Ms. Thompson's residence on the night of January 28, 2014, he knew that he was not allowed to be there due to the no trespass notification and he knew that he was breaking the law by carrying the gun. [Petitioner] denied rehearsing for his testimony at trial. He agreed that the trial was the first time he

12

had claimed self-defense and that he did not contact the police or speak with the police following the shooting about his claim of self-defense. When asked about his refusal to speak with Detective Plumlee following his arrest in Memphis, [Petitioner] stated that he had "invoked [his] right to remain silent."

[Petitioner] agreed that he knew "a lot" about gangs but denied being a member of the Traveling Vice Lords. He denied that two of his tattoos had any relationship to gang affiliation. He agreed, however, that he had made posts on Facebook about "King Neal" who is "head of Vice Lord." The post read "long live King Neal."

Curtis Penney, a CPD officer, testified that he was assigned to the organized crime division, criminal intelligence unit. He explained that this unit identifies and monitors chronic offenders such as gangs or "large scale drug dealings." As part of his job, he gathers "intelligence" through social medial [sic], digital surveillance, interviews, and interrogations. Officer Penney confirmed that in his sixteen year career with the police department he had "worked a lot" with gang-related crime and had become familiar with the gang presence in Chattanooga. Officer Penney testified that gang members identify themselves by "flagging," which means that they carry a specific color bandana or certain tattoos.

Officer Penney stated that, at that time, gangs were the "biggest threat" to Chattanooga. He said that one of the difficulties with prosecuting cases involving gang members was witness intimidation. Officer Penney confirmed that he was familiar with the East Lake Courts area and said that there were two gangs that were prominent in that area: "[t]he Gangster Disciples, and some of our Crip sets." He said that one of the Gangster Disciples' rivals was the Vice Lords, both gangs originating in Chicago. Defense counsel asked Officer Penney what it would mean if a member of the Gangster Disciples displayed a gun tied with a black flag for a member of the Vice Lords. Officer Penney responded that the Vice Lord member would view this as a sign of disrespect.

Ms. Thompson testified that she could not remember when it occurred, but she recalled talking on the telephone with [Petitioner] while at her mother's house. While talking with [Petitioner], the victim entered the room and began talking to Ms. Thompson about [Petitioner]'s disrespectful conduct toward Marylyn Thompson. [Petitioner] overheard the victim and said he was going to "come over there." Ms. Thompson said she urged [Petitioner] not to come over saying, "we don't need those problems." [Petitioner] came to Marylyn Thompson's residence anyway but arrived as the victim was leaving. Ms. Thompson said there might have been "words exchanged," but the victim got into his truck and left. Ms. Thompson agreed that her family was "pretty angry" with [Petitioner] because of the 2013 domestic assault. She agreed that the victim was upset that [Petitioner] had hurt her but denied that the victim made any threats of retaliation against [Petitioner].

The State then called Ms. Thompson in rebuttal. The State asked Ms. Thompson if she recalled an occasion at her mother's residence when Mr. White, Ms.

13

Thompson's father, Marylyn Thompson, Anthony Washington, the victim, and she were all there and the victim's eye was swollen. Ms. Thompson confirmed that she recalled that occasion, agreeing that the victim's eye was swollen but denied that the victim was "ranting," had a gun in his back pocket, or had "words" with [Petitioner].

Ms. Thompson confirmed that in June 2013 [Petitioner] received a trespass notification because the two were arguing at her 6th Avenue unit. Two days later, [Petitioner] returned late at night between 11:00 p.m. and 12:00 a.m. [Petitioner] and Ms. Thompson began arguing upstairs over the presence of Ms. Thompson's friend, Ms. Glenn. The argument escalated and [Petitioner] hit Ms. Thompson from behind with a closed fist and then repeatedly hit her with both fists on her face and arms. [Petitioner] walked downstairs and began hitting Ms. Glenn, who was sitting on the couch. After hitting Ms. Glenn, [Petitioner] angrily grabbed their then four-year-old son and "pushed him down." [Petitioner] paced back and forth and then walked out the front door. Ms. Thompson locked the front door and the public hall door, so [Petitioner] could not return. [Petitioner] beat on the door and then went "around to the back" and broke the kitchen window for entry to the apartment. Ms. Thompson ran into the kitchen and was pushing on [Petitioner] to prevent him from entering. While doing so she cut her arms on the broken glass. [Petitioner] successfully entered the apartment and hit Ms. Thompson once again before running into the living room while Ms. Thompson remained in the kitchen attending to the cuts on her arms. [Petitioner] left for a second time, this time he dropped his cell phone, and Ms. Thompson used the phone to call the police. She was later transported to the hospital and received stitches.

The defense then presented testimony from Christopher Robinson, a private forensic consultant, who testified as an expert in the field of firearms analysis, ballistics, shooting reconstruction, and "policies and procedures for testing of DNA." Mr. Robinson stated that he was "certified in the disciplines of firearms analysis, gunshot residue analysis, crime scene reconstruction, shooting reconstruction, and gunshot wound analysis." In evaluating [Petitioner]'s case, Mr. Robinson had reviewed the discovery including materials from the police department, the crime lab reports, photographs, any video and audio recordings. Mr. Robinson visited the crime scene, spoke with the medical examiner, spoke with [Petitioner], and had sat through the entirety of the trial listening to all the witnesses.

Mr. Robinson testified that he found the results of the DNA testing "unusual" in that areas tested with "a strong appearance of blood" failed to reveal blood. He attributed this to the possibility that there may have been a cleaner used on the spots that would have diluted the blood evidence, referencing a photograph of the kitchen where a mop and bucket could be seen.

Mr. Robinson also took issue with Agent Scott's testimony that, "the powder could travel four to five feet only on high powered rifles." Mr. Robinson stated that in

14

his own testing with .38 Special cartridges, the cartridges believed to be used in the shooting, the powder had never traveled farther than three feet. Mr. Robinson also examined the victim's shirts and the gunshot hole in the shirts. He found no gunpowder particles on the shirts, which indicated that the gun muzzle was two to three feet or greater when fired. He then discussed alternative testing that could have been conducted on the shirts to detect gunpowder particles. Mr. Robinson noted that the victim's shirts were also packaged together which is problematic based upon the possibility of the transfer of particles between the items.

Mr. Robinson testified that when he visited the crime scene he entered an adjacent unit with the same measurements as Ms. Thompson's unit. He described the kitchen area of the unit as "extremely tight" and "very close quarters." The medical examiner told Mr. Robinson during their meeting that the trajectory of the bullet had no upward or downward deviation but was a straight path through the chest. Mr. Robinson stated that, given the [Petitioner]'s height versus the victim's height, there should have been an upward deviation in the bullet path unless the victim was moving toward [Petitioner] in a downward motion, causing a straight path through the body. Mr. Robinson opined that this was consistent with [Petitioner]'s assertion that he acted in self-defense.

On cross-examination, Mr. Robinson agreed that the blood tested that came back as either not human DNA or "a failure to reveal" came from outside on the porch and on a window s[ill]. It did not come from the kitchen.

The Defense recalled Ms. Tony, who testified that she and the victim had dated for two and a half years. She stated that, in her opinion, the victim was not a violent person. Ms. Tony agreed that "Brandon" had told her that, prior to the shooting, [Petitioner] and the victim had "a fight."

Alicia Merriwether testified that she was a record keeper for the Hamilton County general sessions court. Ms. Merriwether identified four judgments of conviction against the victim. The convictions were for: two separate judgments in 2008 for domestic assault, a 2012 domestic assault, and a 2013 assault.

On cross-examination, Ms. Merriwether confirmed that the judgment for the 2013 assault indicated "[c]ase dismissed without hearing proof."

Lajuane Elston, a Hamilton County criminal clerk's office employee, identified a certified copy of the victim's 2008 conviction for robbery.

In rebuttal, the State called Russ Davis, a TBI forensic scientist. Mr. Davis testified as an expert witness in the field of gunshot primer residue. In relation to this case, Mr. Davis tested a black bandana collected from the victim for gunshot primer residue at [Petitioner]'s request. Mr. Davis did not find gunshot primer residue on the bandana.

Eric Qualls, a Hamilton County Sheriff's Office security intelligence officer, testified that he had received special training in gang intelligence and validating gang members. Officer Qualls confirmed that, in the course of his work, he had come into contact with [Petitioner] and observed a tattoo of a crescent moon with a five point star on [Petitioner]'s stomach. Based upon his experience with and training about gangs, he stated that the crescent moon with a five point star was a common symbol for the Vice Lords. Officer Qualls had also seen a tattoo on [Petitioner]'s left forearm of a pistol with a "'T' behind it." Officer Qualls opined that the "T" stood for "TVO" or Traveling Vice Lord. Officer Qualls had also observed a post on [Petitioner]'s Facebook page that stated, "long live King Neal." He believed this was a reference to Neal Wallace, "a founding member of the Traveling Vice Lords."

*Jennings I*, at *1–12 (footnotes omitted). The TCCA affirmed Petitioner's conviction, and the Tennessee Supreme Court ("TSC") denied review. *See generally id*.

Petitioner then filed a pro se petition for post-conviction relief and two amended petitions [Doc. 6-30 at 39–54, 63–67, 76–82]. After holding a hearing [Doc. 6-31], the post-conviction court denied Petitioner post-conviction relief [Doc. 6-30 at 88–130]. Petitioner appealed this denial to the TCCA, which summarized Petitioner's post-conviction proceedings as follows:

In the petitions, the petitioner alleged trial counsel was ineffective for failing to object to: "the State eliciting testimony about Christopher Robinson's job related reprimands;" "the State asserting [its] personal opinion as to the truth or falsity of [the petitioner's] testimony during the State's closing argument;" "the prosecutor stating that [the petitioner] was agitated about not being able to see [his] son during the State's opening statements;" "the introduction of inflammatory 911 calls;" and "the prosecution's exploitation of [the petitioner's] pre-trial exercise of the right to remain silent." The petitioner also alleged trial counsel erred by questioning him during trial about his 2013 domestic assault conviction and gang affiliation, thus opening the door to evidence of his bad character which trial counsel also did not object to as the State cross-examined the petitioner. Both the petitioner and trial counsel testified at the evidentiary hearing held on January 25, 2019.

Trial counsel explained she intended to present a theory of self-defense at trial while also avoiding opening the door to evidence of the petitioner's character for violence or bad acts. To that end, trial counsel filed a motion in limine to exclude the petitioner's 2013 domestic assault conviction from evidence. Though the trial court granted the motion, trial counsel believed the petitioner opened the door to evidence of the domestic assault during his testimony. Specifically, trial counsel asked the petitioner "something to the effect of why did [he] not want the victim to know [his] address or know where [he] lived." Trial counsel expected the petitioner to

16

state he feared the victim, but she "was surprised because [the petitioner's] answer alluded to that 2013 domestic assault." Based upon the petitioner's answer, trial counsel believed the petitioner opened the door to the admissibility of character evidence which she chose to "deal with [ ] on direct rather than letting the State hammer it in front of the jury for the first time." Trial counsel admitted a better practice would have been to obtain a ruling from the trial court as to whether the petitioner opened the door to evidence of his character. However, she maintained "that the door was opened at that point and there was nothing that [she] could do except to try to minimize it."

Consequently, trial counsel also did not object to the State questioning the petitioner about the June 3, 2013 trespass notice. Because she did not specifically recall the incident, trial counsel reviewed a "trespass notice from C[hattanooga] H[ousing] A[uthority] Officer James Avery." She recalled Officer Avery testified on behalf of the State "to negate a self-defense argument and a self-defense jury instruction . . . to show that [the petitioner] [was] not allowed to be [at the apartment] on the day in question." Trial counsel did not recall the State questioning the petitioner about the details of the trespass notice, when the trespass notice was entered into evidence, or why she would or would not have objected to the same. As a result, she could not opine as to whether the facts of the incident prejudiced the petitioner's case. Trial counsel noted the petitioner's trespass status was relevant to the State's rebuttal of the petitioner's self-defense theory and as such, she did not object to its introduction.

Trial counsel also addressed the defense's approach to the introduction of evidence of both the petitioner's and the victim's gang affiliations. According to trial counsel, she and the petitioner discussed the petitioner's knowledge of the victim's prior violence "at length." Trial counsel recalled a question in which the petitioner sought to explain the significance of the bandana he saw on the victim's firearm prior to the shooting and why he was afraid of the victim as a result. Because the petitioner's answer called on his knowledge of the victim's gang affiliation, before he provided the same, the trial court limited the petitioner's testimony about his knowledge of the victim's gang affiliation to the petitioner's reasonable perceptions and his reason for fleeing the scene.

The trial court noted if the petitioner discussed the victim's gang affiliation, "[the petitioner] would be subject to the same thing," and trial counsel agreed that by opening the door to the victim's character, the petitioner's character could also be attacked. According to trial counsel, she and the petitioner weighed the consequences of opening the door "a lot," noting "we talked about that at length. But with the defense theory of self-defense and [the petitioner's] apprehension of the victim, it was almost impossible to avoid that, if not impossible." Trial counsel agreed it would have been best to avoid the victim's gang affiliation altogether based upon the petitioner's character for violence. But, because the petitioner opened the door to the introduction of the evidence during his testimony, trial

counsel did not object when the State questioned the petitioner about his own gang affiliation.

Trial counsel next addressed several evidentiary decisions made during trial. Regarding the State's cross-examination of defense expert, Christopher Robinson, trial counsel stated she did not object when the State questioned Mr. Robinson about his job-related reprimands because she believed "the State had a right to ask him about those issues . . . because it was relevant to his credibility." Regarding the State's opening and closing arguments, trial counsel stated she did not recall the State opining on the truth or falsity of the petitioner's testimony during closing arguments. After reviewing the trial transcript, trial counsel explained she did not object to the State's closing argument because "I didn't think the affirmative statement of the prosecutor saying [the petitioner] lied was him inserting his personal opinion about [the petitioner's] credibility." Similarly, trial counsel also did not find the State's opening statement, wherein it claimed the petitioner was agitated about not being able to see his son, objectionable as she believed the petitioner made statements supporting this claim, though she could not recall any specifics. Finally, trial counsel admitted she "probably should have" objected when the State questioned the petitioner about his decision not to speak with Detective Plumlee prior to trial, and she did not remember why she did not object to the State questioning the petitioner about the petitioner's waiver of rights.

The petitioner entered three 911 phone calls into evidence at the hearing. After playing the three phone calls, trial counsel stated she did not object to the introduction of the evidence because she "didn't think [the calls] were objectionable." Regarding the 911 call made by Penny Collier, wherein Ms. Collier stated she heard someone say he was going to kill everybody, trial counsel admitted she did not know whether Ms. Collier had personal knowledge of the statement but remembered she attempted to "get in touch with [Ms. Collier]" prior to trial. Trial counsel could not recall why she did not redact Ms. Collier's 911 call. Trial counsel also did not recall why she did not object to Tirrea Tony identifying her 911 call or the State's questioning of Ms. Tony regarding the call. The petitioner also entered into evidence the 911 call made by Cheslei Thompson on June 5, 2013, during the domestic assault incident. After doing so, trial counsel explained she did not object to the introduction of the same because she "believed [the petitioner] opened the door."

During cross-examination, trial counsel explained she was appointed to the petitioner's case in July 2015, and she tried the case in April 2016 with the assistance of co-counsel. Trial counsel met with the petitioner before trial and discussed his decision to testify. Trial counsel understood from the beginning stages of the case that the petitioner intended to testify, but explained the petitioner "didn't want to prepare for his testimony because he didn't want to seem coached." Trial counsel indicated she "would have liked to have gone through the topics that we were going to address," but she did not believe the petitioner "wanted to do that with [her]." Despite the fact she and the petitioner did not fully prepare for his

18

testimony, trial counsel "remember[ed] telling [the petitioner] that any time a defendant testifies that it's going to put him at risk of opening the door for character evidence." Trial counsel conducted a *Momon* hearing and discussed the potential pitfalls of testifying with the petitioner after which the petitioner chose to testify. Despite the inherent risks, trial counsel did not know how to raise the theory of self-defense absent the petitioner's testimony.

Regarding the introduction of evidence of the domestic assault, trial counsel explained she did not intend on introducing that evidence as its inadmissibility was fully litigated prior to trial. However, the defense planned to introduce evidence of the victim's gang affiliation "because of the bandana that was tied to the gun in the victim's pocket." Trial counsel and the trial court both explained to the petitioner that "if we explored [the victim's gang affiliation] that [the petitioner's] affiliation or his character to that extent could be attacked." Trial counsel believed the petitioner understood the options he faced regarding this issue.

Trial counsel met with Mr. Robinson several times before trial and obtained expert funds to retain him. Trial counsel did not recall the specific job-related issues addressed by the State during Mr. Robinson's cross-examination, but remembered Mr. Robinson discussed his issues with her and they were "all about political funding basically." She did not remember that Mr. Robinson shot himself in the hand while working.

Turning again to the petitioner's direct examination, trial counsel explained the petitioner surprised her with his answer to her question of "why [the petitioner] did not want the victim to know where he lived or to know his address." When trial counsel asked the petitioner the same question during a jail visit, the petitioner answered that he was afraid of the victim. At trial, however, the petitioner answered the question by referencing the domestic assault incident with Ms. Thompson. Trial counsel believed the petitioner's answer at trial "opened the door to [the domestic assault conviction]; and so [she] thought at that point [she] had to deal with it on direct." In order to diminish the impact of the testimony, trial counsel asked the petitioner to explain what he was talking about. During re-direct examination, trial counsel again confirmed she did not intend to open the door to the petitioner's character for violence in support of their theory of self-defense, but noted their defense theory "kind of morphed" from apprehension-of-the-victim to first-aggressor after "all the character evidence came in."

The petitioner then testified, stating he met with trial counsel approximately four or five times before trial, but they "never discussed the gang affiliation." According to the petitioner, they "only discussed what happened leading up to the shooting, and I stressed to her that I wanted to pursue an apprehension-of-the-victim self-defense theory because I had a character for violence myself," and he did not want to open that door. However, the petitioner knew "[t]hat if I testified that I would be waiving my rights, and I totally understood that. And I signed my waiver -- my rights waiver form, and I took the stand and testified." The petitioner planned to

19

testify at trial to support the defense theory of apprehension-of-the-victim, believing this theory would "avoid opening the door to [his] character for violence." Regarding his understanding of how he planned to use his knowledge of the victim's character at trial, the petitioner stated, "I never discussed with [trial counsel] using evidence of my knowledge of the victim's gang affiliation to prove my fear. I only discussed prior incidents that I had with [the victim]. One being the prior fight, and, two, [ ] where I seen him have a firearm in his right back pocket." The petitioner reviewed a portion of the trial transcript wherein the trial court, trial counsel, and the State discussed the introduction of gang-related evidence. The petitioner summarized the arguments, noting the State argued gang-related evidence should be excluded based upon its prejudicial nature and its potential to open the door to the domestic assault conviction while trial counsel argued the defense should be allowed "to put forth [the petitioner's] knowledge of [the victim's] gang affiliation to show how [the petitioner] perceived the flag in his back pocket" in order to "prove [the petitioner's] state of mind." By doing so, however, the petitioner did not believe he was "opening the door to [his] gang affiliation."

The petitioner also stated he invoked his right to remain silent prior to trial, and trial counsel did not object to the State's questioning of the petitioner's decision during his trial testimony. In conclusion, the petitioner stated:

> . . . I wish [trial counsel] had of stuck to our original plan and objected to the Fifth Amendment right, my Fifth Amendment rights being violated, and the 911 tapes being played throughout the trial. And had [trial counsel] done those things, the outcome of the trial would have been different. And due to all the prejudice I sincerely feel that the jury's attention was directed toward the prejudice and not the real evidence at trial. Convicted me based on my bad character.

*Jennings v. State*, No. E2019-00343-CCA-R3-PC, 2019 WL 6216350, at *9–12 (Tenn. Crim. App. Nov. 20, 2019) ("*Jennings II*"). The TCCA affirmed the denial of the post-conviction petition. *See generally Jennings II*, at *12–17.

Petitioner next filed the instant § 2254 petition.

## II.     STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") allows a federal court to grant habeas corpus relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable

20

application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold") (citing *Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## III. ANALYSIS

The Court will address Petitioner's claims challenging the sufficiency of the evidence and the propriety of the prosecution's trial questions regarding his invocation of his Fifth Amendment right to remain silent before addressing his ineffective assistance of counsel claims.

### A. Sufficiency of the Evidence

Petitioner first challenges the sufficiency of the evidence to support his second-degree murder conviction by asserting that "[t]he state failed to prove the knowing element beyond a reasonable doubt because there is no evidence that the shooting was done deliberately" [Doc. 1 at

21

5]. In its opinion affirming this conviction, the TCCA described the elements of second-degree murder under Tennessee law as follows:

> "Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39–13–210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39–11–302(b).

*Jennings I*, at *18.

The United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the controlling rule for Petitioner's claim challenging the sufficiency of the evidence to support his second-degree murder conviction under § 2254. *See Gall v. Parker*, 231 F.3d 265, 287–88 (6th Cir. 2000), *superseded by statute on other grounds, as recognized in Parker v. Matthews*, 567 U.S. 37 (2012). In *Jackson*, the Supreme Court held that the evidence is sufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. In making this determination, the district court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

A federal habeas court reviewing the sufficiency of the evidence must apply two levels of deference. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). First, under *Jackson*, the court gives deference to the verdict "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (citing *Jackson*, 443 U.S. at 324 n.16); *see also Cavazos v. Smith*, 565 U.S. 1, 6–7 (2011) (providing that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*,

443 U.S. at 326). The habeas court must give additional deference to the state court's consideration of the verdict under the AEDPA's highly deferential standards. *Cavazos*, 565 U.S. at 6 (noting the double deference owed "to state court decisions required by § 2254(d)" and "to the state court's already deferential review"). As such, a petitioner challenging the evidence against him "bears a heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986).

Petitioner raised a claim challenging the sufficiency of the evidence to support his second-degree murder conviction in his direct appeal to the TCCA, which cited *Jackson* and various state court cases before analyzing this claim as follows:

> The evidence, considered in the light most favorable to the State, proves that [Petitioner], unlawfully armed with a gun, went to Ms. Thompson's 6th Avenue unit unannounced and in violation of a trespass notification. He wanted to see his children and engaged in an argument with Ms. Thompson, insisting she awaken their sleeping two-year-old child. She declined to do so and asked [Petitioner] to leave. The victim entered the kitchen area where [Petitioner] and Ms. Thompson were arguing and told [Petitioner] they did not want any "trouble." [Petitioner] agreed and exited. As the unarmed victim went to close the door behind [Petitioner], [Petitioner] fired his gun at the victim's chest. [Petitioner] then fled the scene, disposed of the weapon, and hid from police. As a result of [Petitioner]'s conduct, the victim died of a gunshot wound.

> The evidence at trial showed that [Petitioner] shot the victim in the chest, ultimately causing his death. Although there was evidence that [Petitioner] was fearful and acted in self-defense, the jury rejected this theory, which is within its province. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Thus, the evidence is sufficient to sustain [Petitioner]'s conviction for second degree murder.

*Jennings II*, at *18.

Petitioner bases his claim challenging the sufficiency of the evidence to support his second-degree murder conviction in his § 2254 petition on his assertion that the state failed to prove beyond a reasonable doubt that he knowingly killed the victim [Doc. 1 at 5]. But this assertion is without merit. As set forth above, multiple witnesses at trial testified that after Petitioner engaged in a verbal dispute with Ms. Thompson over their children at Ms. Thompson's residence, he shot

the unarmed victim in the chest as the victim went to close the door behind Petitioner as he was leaving.

While Petitioner presented evidence that he shot the victim as an act of self-defense because the victim had reached for a firearm [Doc. 6-8 at 73–85], he points to no evidence in the record indicating that he did not shoot the victim deliberately. And while the prosecution did not offer direct proof that Petitioner knew his act of shooting the victim was reasonably certain to kill the victim, it is apparent that the jury determined that this was the case based on the direct and circumstantial evidence presented at trial. As the TCCA noted, this was proper under Tennessee law. *Jennings II*, at *17 (noting that a jury may base a finding of guilt "on direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence") (citing *State v. Pendergrass*, 13 S.W. 3d 389, 392–93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W. 250, 253 (Tenn. Crim. App. 1990)).

In short, the record supports the TCCA's finding that the evidence was sufficient to support Petitioner's conviction. Accordingly, Petitioner has not established that this holding was an unreasonable determination of the facts in light of the evidence presented, or an unreasonable application of federal law, and he is not entitled to habeas corpus relief for this claim.

## B. Questions Regarding Fifth Amendment Silence

Petitioner next claims that "[t]he state improperly commented on [his] [F]ifth Amendment right to remain silent . . . . during cross examination" [*Id.* at 6]. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Criminal defendants have a right to remain silent and doing so cannot be used as substantive evidence of guilt. *Griffin v. California*, 380 U.S. 609, 615 (1965). And a

defendant's silence during custodial interrogation may not be used to impeach the defendant's testimony at trial. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976).

Petitioner raised this claim to the TCCA in his appeal of his conviction, and the TCCA addressed it in relevant part as follows, after citing *Doyle*:

> [Petitioner] testified at trial that his act of shooting the victim was in self-defense. Throughout the trial the defense repeatedly questioned witnesses about the victim's aggressive actions toward [Petitioner] both on the night of the shooting and prior to the shooting. These questions were phrased in a manner that implied that the victim was the first aggressor, and [Petitioner] feared the "crazy" victim who was a gang member. The State, in response[] to the defense theory, questioned [Petitioner] about his actions following the shooting in light of his testimony that he acted in self-defense.
>
> State: You've listened to all the testimony; is that right?
>
> [Petitioner]: That the witnesses testified to, yes. That's right.
>
> State: And now you're ready to tell the jury your story.
>
> [Petitioner]: I've already told them my story.
>
> State: Two years later.
>
> [Petitioner]: Two years later, the same way it happened on that night. I've told the jury how it happened that night right here in this courtroom.
>
> State: That you were—as this is as close as I can get, you were in imminent threat of bodily injury; right?
>
> [Petitioner]: Yes.
>
> State: And you couldn't retreat?
>
> [Petitioner]: No, sir. Not safely.
>
> State: And those are your words; right?
>
> [Petitioner]: Yes.
>
> State: Those are your words.
>
> [Petitioner]: Yes.
>
> State: Not rehearsed.

[Petitioner]: No.

State: Nobody else's words.

[Petitioner]: No, sir.

State: This is the first time you've ever really public[]ly said that it's self-defense, is that right?

[Petitioner]: Yes.

State: You didn't call the police or 911 that night.

[Petitioner]: No, sir.

State: You didn't wait around for the police.

[Petitioner]: No, sir.

State: You didn't go to a safer place and contact the police and let them know what happened.

[Petitioner]: No, sir, I was afraid to.

State: You didn't tell them, hey, I just shot a guy because I was in imminent threat of bodily injury and I couldn't retreat.

[Petitioner]: No, sir.

State: You didn't tell them that.

[Petitioner]: No, sir. I mean, it's not wise to talk to the police without counsel, and I didn't have counsel at that time. If I told the police that, I would like to tell the police that with counsel.

State: And you refused to talk to Detective Plumlee; is that correct?

[Petitioner]: I'm trying to think of a good way to say this. I invoked my right to remain silent.

State: You refused to give a statement to Detective Plumlee; is that correct?

[Petitioner]: I invoked my right to remain silent.

State: You refused to tell him your story.

26

During closing argument, the State only once referenced this line of questioning saying, "Someone who acts in self-defense and has no reason to think that anything is going to happen to them doesn't run off and destroy evidence."

\*        \*        \*

[I]n our view, the prosecutor, having heard [Petitioner]'s testimony characterizing the victim as a violent gang member, did not err by asking [Petitioner] on cross-examination about his actions following the shooting that he claimed was in self-defense. For the most part, the questions asked were a fair response to the defense theory and questioning throughout the trial to that point. We do note, however, that the prosecutor's last two questions and the statement, "You refused to tell him your story," were improper comments on [Petitioner]'s invocation of his right to remain silent and w[ere], in our view, clearly outside the scope of a "fair response" to the defense theory. *See United States v. Robinson*, 485 U.S. 25, 32 (1988) (holding that prosecutors are not prohibited from commenting upon a defendant's decision not to testify at trial so long as the prosecutorial comment is simply a "fair response" to defense claims and the prosecutorial comment does not treat [Petitioner]'s silence as "substantive evidence of guilt"); *State v. Cazes*, 875 S.W.2d 253, 267 (Tenn. 1994) (applying *Robinson* to reject a *Griffin* claim). W[e] conclude it was error for the prosecutor to ask the last two questions and make the statement "you refused to tell [Detective Plumlee] your story." Nonetheless, any error, given the weight of the evidence against [Petitioner], the prosecutorial error was harmless beyond a reasonable doubt. *See State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014). [Petitioner] is not entitled to relief as to this issue.

*Jennings I*, at \*15–16.

Petitioner has not established that this was an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence presented. As set forth above, the majority of the prosecutor's relevant questions concerned Petitioner's pre-arrest silence and fairly rebutted Petitioner's direct examination testimony and defense. As such, they were proper. *Jenkins v. Anderson*, 447 U.S. 231, 238–39 (1980) (providing that the use of pre-arrest silence for impeachment does not violate due process). And the Court agrees with the TCCA that while the prosecutor's last two questions and comment about Petitioner refusing to speak to Detective Plumlee improperly commented on Petitioner's invocation of his Fifth Amendment rights, they do

not entitle Petitioner to relief, as the substantial evidence of Petitioner's guilt from multiple other witnesses presented at trial leaves the Court with no doubt that the prosecution's improper commentary about Petitioner's post-arrest silence did not affect the jury's verdict. *Lundgren v. Mitchell*, 440 F.3d 754, 780 (6th Cir. 2006) (noting that while prosecutorial commentary on a defendant's silence "is improper and may rise to the level of prosecutorial misconduct requiring reversal on appellate review," reversal is not needed where "the comment amounted to harmless error beyond a reasonable doubt," such as where the other evidence of the defendant's guilt is compelling and the record establishes the improper commentary did not affect the jury's verdict) (citations omitted).

Thus, Petitioner is not entitled to relief under § 2254 for this claim.

## C.    Ineffective Assistance of Counsel

Petitioner next asserts that his counsel was ineffective in five different ways at trial, specifically by (1) eliciting "testimony about [his] prior domestic assault conviction and it[]s underlying facts"; (2) eliciting testimony regarding the facts underlying his trespass notification; (3) eliciting testimony about the victim's gang affiliation; (4) failing to redact Penney Collier's 911 phone call; and (5) failing to "thoroughly investigate Christopher Robinson's background before calling him to testify [Doc. 1 at 8]. The Court will set forth the applicable standard of review before addressing each of these claims in turn.

### i.    Standard of Review

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court set forth a two-pronged

test for evaluating claims for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was
> deficient.   This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.   Second, the
> defendant must show that the deficient performance prejudiced the
> defense.   This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose result
> is reliable.  Unless a defendant makes both showings, it cannot be
> said that the conviction . . . resulted from a breakdown in the
> adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  A petitioner has the burden of proving that his counsel provided

ineffective assistance.  *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney

performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

A party asserting an ineffective-assistance-of-counsel claim must "identify the acts or omissions

of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at

690.  The evaluation of the objective reasonableness of counsel's performance must be made "from

counsel's perspective at the time of the alleged error and in light of all the circumstances, and the

standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient

performance prejudiced the defense.   Thus, "[a]n error by counsel, even if professionally

unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had

no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim

for ineffective assistance of counsel to meet her burden, and if either prong is not satisfied, the

claim must be rejected. *Strickland*, 466 U.S. at 69.  Moreover,  a  habeas  petitioner  alleging

ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### ii.     Petitioner's Domestic Assault Conviction

Petitioner first claims that his trial counsel erred in eliciting testimony from him about his prior domestic assault petition [*Id.*]. The TCCA addressed this claim as follows:

> At the post-conviction hearing, trial counsel explained that both prior to and during trial she asked the petitioner why he did not want the victim to know where he lived. Each time she asked the question, the petitioner provided different answers. Prior to trial, the petitioner answered by stating he was afraid of the victim. However, at trial, the petitioner answered by stating "[i]n retaliation for something that I did in the past that I'[m], very regretful for." Trial counsel was surprised by the petitioner's trial answer and believed he opened the door to the introduction of evidence about his domestic assault conviction. As such, trial counsel decided to address the damaging evidence during direct examination rather than wait for the State to impeach the petitioner with evidence of the conviction during cross-examination.

> Accordingly, the record shows trial counsel made a strategic decision to address the petitioner's domestic assault conviction during his direct examination after the petitioner opened the door to the same. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." *Nesbit v. State*, 452 S.W.3d 779, 796 (Tenn. 2014) (citing *Goad*, 938 S.W.2d at 369). In denying relief on this issue, the post-conviction court accredited the testimony of trial counsel and found "it was a reasonable tactical decision by [t]rial [c]ounsel to 'steal the State's thunder' by discussing the prior offense on direct examination." We agree. The petitioner has failed to demonstrate trial counsel's defense strategy was unreasonable, fell below professional norms, or that it prejudiced the outcome of his case. *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 687, 688; *Baxter*, 523 S.W.2d at 936). Instead, the record indicates trial counsel attempted to diminish the damaging evidence of the petitioner's prior conviction by addressing it during his direct examination rather than allowing the State to reveal the evidence to the jury during cross-examination. The petitioner is not entitled to relief.

*Jennings II*, at *13–14. The TCCA also noted that, in its opinion affirming Petitioner's second-degree murder on direct appeal, it "determined 'the defense had already elicited testimony about the 2013 domestic assault, which opened the door to the prosecution's line of questioning' and

'there is no dispute that the [petitioner] placed the 2013 domestic assault at issue during his proof.'"
*Id.* at *14 n.7 (quoting and citing *Jennings I* at *13, 14).

Petitioner has not established that the TCCA's denial of this claim was an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence presented. As the TCCA correctly noted, Petitioner's response to his counsel's question asking why he did not want the victim to know where he lived, in which Petitioner stated that he had done something for which he was "regretful" and which the record as whole establishes was a clear reference to the June 2013 domestic violence incident, surprised his counsel, who had expected Petitioner to answer that he feared the victim [Doc. 6-31 at 8–12]. Petitioner's counsel interpreted this statement to open the door to evidence of Petitioner's domestic violence conviction and therefore decided to confront the evidence of that domestic violence conviction head-on, rather than allow the prosecution to introduce it first [*Id.*]. But Petitioner's counsel acknowledged at the post-conviction hearing that it would have been better for her to stop the trial proceeding to ask the Court to determine whether Petitioner had opened the door to such evidence and stated that, in hindsight, she would have done things differently with regard to this issue [*Id.*].

First, to the extent that Petitioner challenges his counsel's decision to ask him why he did not want the victim to know where he lived, which he characterizes as eliciting testimony about the domestic violence conviction, Petitioner has not established that this was deficient performance, as the record establishes that Petitioner's counsel did not expect this question to elicit testimony about the domestic violence conviction. And the record establishes that it was reasonable for Petitioner's counsel's not to foresee that this question would elicit such testimony from Petitioner, as (1) Petitioner answered this question differently prior to trial [*Id.* at 8–12],[4] (2)

---

[4] Additionally, to the extent this claim could be liberally construed to challenge Petitioner's counsel's failure to properly prepare Petitioner for this question at trial, Petitioner's trial counsel testified at the post-conviction hearing

31

the trial court had previously ruled during the trial, and in Petitioner's presence, that evidence of the domestic violence conviction could not come in as evidence at trial [Doc. 6-6 at 139], and (3) the record establishes that Petitioner and his trial counsel had discussed keeping evidence of the domestic violence conviction out of the trial [Doc. 6-31 at 9–10].

Moreover, to the extent that Petitioner challenges his counsel's decision to elicit additional testimony from him about the domestic violence conviction after he unexpectedly brought up the incident without first asking the Court to determine whether he had opened the door to such evidence, Petitioner also has not established that this was deficient performance. To the contrary, Petitioner's counsel's decision to go ahead and introduce evidence regarding the domestic violence incident based on her belief that Petitioner had opened the door to that evidence was reasonable in light of, among other things, the manner in which the trial court had addressed this issue during prior trial discussions [*See*, *e.g.*, Doc. 6-6 at 144 (trial court statement that "if [the defense] open[s] the door to the domestic assault, the rest of it comes in" and Doc. 6-7 at 141–42 (trial court statement that if the defense brings in evidence that Petitioner feared the victim due to the domestic violence incident, then the defense "open[s] the door to admission of that. And quite possibly the underlying facts . . .")], as well as the manner in which the trial court had treated another issue previously in the trial [*See*, *e.g.*. Doc. 6-7 at 72–85 (trial court ruling that he would allow the prosecution to introduce evidence that Petitioner was found in a closet after the defense offered evidence that Petitioner was not charged with resisting or evading arrest after United States Marshals found him in Memphis)]. Thus, while Petitioner's counsel's decision to introduce evidence regarding the domestic violence conviction without first asking the Court to rule that

---

that while she wanted to prepare for trial by going through the topics she was going to address with Petitioner on direct examination with Petitioner, Petitioner did not want to do so because he did not want to seem coached [Doc 6-31 at 53–54].

Petitioner had opened the door to that evidence may have "deviated from best practices or [the] most common custom," Petitioner has not demonstrated that it "amounted to incompetence." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). As such, the Court must defer to that decision. *Id.*

Petitioner therefore has not established that the TCCA's determination that Petitioner was not entitled to relief for this claim was an unreasonable application of *Strickland*, or that the Supreme Court has found that a materially similar decision of counsel amounted to ineffective assistance of counsel. Accordingly, Petitioner is not entitled to habeas corpus relief for this claim.

### iii.     Trespass Notification

Petitioner next asserts that trial counsel was ineffective for "elicit[ing] testimony about facts leading up to the trespass notification" [Doc 1 at 8]. The TCCA addressed this claim as follows:

> Similarly, the petitioner claims trial counsel was ineffective "by failing to object to the State's improper questions concerning facts leading up to the trespass notification" because "[t]he door was not opened to the June 3, 2013 disorderly conduct incident by the defense." The petitioner asserts he was prejudiced by this evidence as it again "shows that [he] has a propensity to commit a crime." At the post-conviction hearing, trial counsel explained she did not object to questions regarding the trespass notice because it was relevant to the State's rebuttal of the defense's theory of self-defense and, as a result, she did not believe it was objectionable. Our review of the record supports trial counsel's testimony as evidence of the trespass notice was clearly admissible. Accordingly, the petitioner cannot prove prejudice regarding trial counsel's handling of this evidence at trial. *Strickland*, 466 U.S. at 687, 694; *see also Goad*, 938 S.W.2d at 370. The petitioner is not entitled to relief.

*Jennings II*, at *14.

The Court agrees with the TCCA. Specifically, it is apparent from the jury instructions in the record that the issue of whether Petitioner was in a place where "he . . . had a right to be" was relevant to whether the jury could find that Petitioner was entitled to use force that was "intended

or likely to cause death or serious bodily injury" on the victim [Doc. 6-10 at 148–49]. *See also* Tenn. Code Ann. 39-11-611(b)(1)(2). As such, Petitioner has not established that the TCCA unreasonably applied *Strickland* in determining that Petitioner was not entitled to relief for this claim, or that the Supreme Court has found that counsel provided ineffective assistance of counsel based on substantively similar facts. Accordingly, Petitioner is not entitled to habeas corpus relief for this claim.

### iv. Gang Affiliation

Petitioner also claims that his counsel was ineffective for "elicit[ing] testimony about the victim's gang affiliation" [Doc. 1 at 8]. The TCCA addressed this claim as follows:

> Finally, the petitioner asserts trial counsel "was ineffective by eliciting testimony about the victim's gang affiliation" in an effort to prove the petitioner's state of mind "because there was [also] proof of [the petitioner] being a gang member." The petitioner argues once again that the jury convicted him based upon his bad character and that trial counsel's handling of this evidence "was not based on the law and facts of the case." The State asserts trial counsel utilized this evidence to support the defense theory of self-defense, a strategy accredited by the post-conviction court. We again agree with the State.
>
> The record makes clear the petitioner and trial counsel pursued a self-defense theory at trial. Trial counsel explained she wanted to discuss the victim's gang affiliation in order to show the petitioner acted in self-defense based upon his fear of the victim. However, trial counsel did not know how to present the defense absent the petitioner's testimony. As a result, trial counsel attempted to prepare the petitioner for the inherent risks of testifying, including the risks he faced in discussing the victim's gang affiliation, but the petitioner wanted to testify absent much direction from trial counsel. Regardless, after the petitioner waived his rights and began testifying at trial, both the trial court and trial counsel warned him if he opened the door to the victim's gang affiliation he would be subject to the same attack by the State. The petitioner proceeded with his testimony, explaining he saw a bandana tied to the victim's firearm which led him to fear the victim based upon his known gang affiliation which opened the door for evidence of the petitioner's gang affiliation to come into trial.
>
> It is evident trial counsel made a strategic decision to address the victim's gang affiliation during the petitioner's testimony in order to support the theory of self-defense. Though the jury rejected the theory, the jury's rejection is not evidence of deficiency. *Nesbit*, 452 S.W.3d at 796. The post-conviction court determined, "[a]t

the point in time where the decision was made to explain [the petitioner's] perception of the victim further, [t]rial [c]ounsel had considered the consequences of doing so and believed this to be the best course in which to pursue the claim of self-defense." Additionally, the post-conviction court held, "[f]rom the perspective of [t]rial [c]ounsel, it was reasonable to believe that without additional proof that the victim intended to harm [the petitioner] in the moment, the claim of self-defense would have been substantially weakened." We agree. Nothing in the record demonstrates trial counsel's strategy regarding gang-affiliation evidence was not sound and the petitioner has failed to show that trial counsel's strategy regarding the evidence amounted to deficient performance. *Strickland*, 466 U.S. at 689; *see* Tenn. Code Ann. § 40-30-110 (f); *Goad*, 938 S.W.2d at 369. Instead, the record shows trial counsel made a strategic decision to use the victim's gang affiliation to support the theory of self-defense, a strategy which was supported by the petitioner and for which he was fully advised. The petitioner is not entitled to relief.

*Jennings II*, at *14–15 (footnote omitted).

Petitioner has not established that this was an unreasonable application of federal law, or an unreasonable determination of the facts. The record establishes that before the relevant gang affiliation testimony came in at Petitioner's trial, the trial court had lengthy, in-depth discussions with the parties about the probative value of this evidence and the fact that admission of the evidence would open the door to Petitioner's own gang affiliation [Doc. 6-8 at 86–99]. The record also indicates that prior to and/or during trial, Petitioner and his counsel had lengthy discussions about the risks inherent in introduction of this evidence, and Petitioner understood those risks [Doc. 6-31 at 26–31, 55-56]. Thus, it is apparent that Petitioner's counsel's strategic decision to introduce the gang affiliation evidence was well-informed, and the Court will not second guess it with the benefit of hindsight. *See Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) (noting that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004) (holding that "strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation").

Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### v.     Penney Collier's 911 call

Petitioner next claims that his trial counsel was ineffective for not redacting Penney Collier's 911 call [Doc. 1 at 8]. The TCCA addressed this claim as follows:

> The petitioner argues trial counsel was ineffective for failing to redact portions of Ms. Collier's 911 phone call based upon unreliable hearsay statements made during the call. The petitioner further asserts Ms. Collier's statements "did not qualify as an excited utterance because her 911 call does not indicate that she saw the shooting" and her statements were "detrimental to [the petitioner's] self-defense theory." The State contends trial counsel's handling of Ms. Collier's call was not deficient as she objected to the introduction of the same based upon a violation of the Confrontation Clause.
>
> Though trial counsel lacked a precise recollection of her handling of this evidence, the record demonstrates trial counsel objected to the introduction of Ms. Collier's 911 call as a violation of the Confrontation Clause while the State argued the call fell under the excited utterance exception to the hearsay rule. The trial court agreed with the State and overruled trial counsel's objection. Upon its review, the post-conviction court explained the issue, as follows:
>
>> The [c]ourt does not believe that the phone call was subject to an objection on the basis of a lack of personal knowledge . . . .
>>
>> In this case of Ms. Collier's 911 call, she stated that she "heard" someone make a statement that [the petitioner] contests . . . . The fact that Ms. Collier acknowledged that she heard the statement was sufficient to establish her personal knowledge of the statement itself. As such, the [c]ourt disagrees that [t]rial [c]ounsel's failure to object to this phone call on the basis of a lack of personal knowledge was deficient performance.
>>
>> The [c]ourt also finds that [t]rial [c]ounsel's performance in failing to object to the admission of this call based on other grounds, or [t]rial [c]ounsel's failure to request redactions, was not deficient. The statement overheard by Ms. Collier was relevant to establish (or to confirm) [the petitioner's] anger prior to, or during, the shooting of [the victim] and to rebut his claim of self-defense. Moreover, the [c]ourt does not find that anything in the 911 call was unfairly prejudicial to [the petitioner], as the evidence did not have "an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one." As such, [the petitioner] has failed to show that Rule 403's balancing test would [] have excluded the evidence at trial.

36

> Finally, although [the petitioner] was able to contradict this
> statement with other proof at trial -- at least one of the witnesses
> denied hearing such a statement -- and although [the petitioner]
> denied making the statement at the post-conviction hearing, the
> contested nature of the evidence did not render its admission
> "unfairly prejudicial." Indeed, while the contested nature of the
> evidence may have impacted the weight of the evidence in the
> balance, it did not affect its admissibility. Consequently, [the
> petitioner] has failed to show that [t]rial [c]ounsel rendered
> deficient performance in not raising objections to Ms. Collier's
> phone call. Accordingly, the [c]ourt respectfully declines to grant
> post-conviction relief with respect to this issue.

Upon our review, we agree with the post-conviction court's assessment of trial
counsel's handling of Ms. Collier's 911 phone call. Trial counsel objected to the
introduction of the call based upon the Confrontation Clause, but the trial court
determined the call was admissible as an excited utterance, thus eliminating any
confrontation arguments. Though trial counsel's objection was unsuccessful,
per *Davis v. Washington*, any objection made on the basis of the Confrontation
Clause or hearsay would have been unsuccessful. 547 U.S. 813, 828 (holding,
generally, that 911 calls are nontestimonial in nature as the interrogation that arises
during such calls "objectively indicate[s] its primary purpose was to enable police
assistance to meet an ongoing emergency"). Therefore, the petitioner cannot show
that trial counsel was deficient or that he was prejudiced by trial counsel's handling
of Ms. Collier's 911 phone call as it was clearly admissible evidence. *Id.* The
petitioner is not entitled to post-conviction relief as to this issue. *Strickland*, 466
U.S. at 694.

*Jennings II*, at *15–16.

The Court agrees with the TCCA. Petitioner does not specify in his petition why he asserts

that his counsel was ineffective for not redacting Ms. Collier's 911 call, but to the extent that he

raises the same arguments he did with the TCCA [Doc. 6-40 at 17], he has not established that the

TCCA's denial of this claim was an unreasonable application of federal law, or an unreasonable

decision based on the facts.

In her 911 call, Ms. Collier first asks the operator to have the police "come on now" because

someone has been shot, provides the address of her location, and states that she hears an ambulance

and therefore someone else may have called [Doc. 10, Collier 911 Call Exhibit at 00–00:48]. Ms.

Collier then indicates that she "heard the gunshot" while she and others were in the kitchen [*Id.* at 00:48–55]. Ms. Collier further states that she heard people "hollering over here next door" and that she is not opening her door "to nobody" because "a dude talking about he gonna kill everybody in here" [*Id.* at 00:56–1:07]. Ms. Collier also affirms that she has her door locked and states that she is worried about her "grandbabies" before repeating that she heard "some dude talking about he going to shoot everybody. . . ." in response to the operator's question about what she had heard [*Id.* at 1:08–1:30]. Ms. Collier then repeats her request for the operator to "get the police over here quick," provides her name, and states that she refused to open the door when someone knocked and tried to get her to open her door because she was not going to open her door to anybody [*Id.* at 1:31–2:00]. Ms. Collier next repeats her name and provides her phone number, and the 911 operator repeats the address of Ms. Collier's location and states officers are enroute [*Id.* at 2:00–2:33]. The call ends after Ms. Collier tells the operator that the police have arrived, and the operator tells her to talk to them [*Id.* at 2:33–3:02]. Throughout the call, Ms. Collier sounds distressed, breathes heavily, and repeats "oh Lord" [*See generally id.*].

As the TCCA noted, Petitioner's counsel objected to admission of Ms. Collier's phone call based on the Confrontation Clause, but the trial court overruled that objection [Doc. 6-4 at 146]. And Petitioner has not established the TCCA's decision that the statements in Ms. Collier's 911 call were "clearly admissible," and therefore not otherwise objectionable, was erroneous. To the contrary, it is apparent that Ms. Collier's statements in her 911 phone call fell within the excited utterance hearsay exception under Tennessee law, as the contents of the call establish that (1) this call resulted from startling events, specifically Ms. Collier hearing a gunshot at her neighbor's home soon before someone knocked on her door and tried to get in and she heard a "dude" make a statement indicating his intention "to kill everybody"; (2) Ms. Collier's relevant statements in the

911 phone call relate to those startling events; and (3) Ms. Collier made the 911 call while she was

under the stress or excitement of those events. *State v. Franklin*, 308 S.W. 3d 799, 823 (Tenn.

2010) (noting that the requirements for the excited utterance exception to apply under Tennessee

law are (1) "a startling event or condition that suspend[s] the normal reflective processes of the

declarant," (2) that the statement relates to the startling event or admission; and (3) that the declarant

made the statement "under the stress or anxiety from the event or admission") (quotations and

citations omitted).

While Petitioner asserted in his TCCA appellate brief that the statements in the 911 call did

not fit within the excited utterance exception because Ms. Collier did not state during this call that

she saw the shooting, Petitioner supported this assertion only by stating that "[a] bystander's

declaration must relate to that which has come under his observation" [Doc. 6-40 at 17 (citing

*Montesi v. State*, 417 S.W.2d 554 (Tenn. 1967)].  But it is apparent from the contents of the 911

call that Ms. Collier observed the shooting by hearing the gunshot [Doc. 10 Collier 911 Call at

00:48–1:07].  Thus, this argument is without merit.

Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

### vi.    Failure to Investigate Christopher Robinson

As set forth above, Petitioner also claims that his trial counsel was ineffective for not

"thoroughly investigat[ing] Christopher Robinson's background before calling him to testify"

[Doc. 1 at 22–23].  The TCCA addressed this claim as follows:

> The petitioner asserts "[p]roof of Christopher Robinson's reprimands were
> detrimental to [his] self[-]defense theory" and "[d]eference cannot be made to [trial
> counsel's] choice of calling Christopher Robinson to testify because she did not
> thoroughly investigate [his] background."
>
> *        *        *

The defense offered Christopher Robinson as an expert at trial, and the State questioned Mr. Robinson regarding job-related reprimands he received in an effort to attack his credibility. Trial counsel explained she did not object to the State's impeachment efforts because she believed "the State had a right to ask him about those issues . . . because it was relevant to his credibility." The post-conviction court agreed, noting "the State's impeachment of Mr. Robinson here was entirely permissible." The post-conviction court determined "because [the petitioner] has failed to show that the State's questions were objectionable, he has also failed to show that [t]rial [c]ounsel rendered deficient performance in not raising objections." We agree with the post-conviction court. Nothing in the record indicates trial counsel rendered deficient performance in this regard. *Goad*, 938 S.W.2d at 369. Furthermore, we note that the petitioner failed to present an expert during the post-conviction hearing in order to show there was another more "credible" expert available to trial counsel. Thus, the petitioner cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). The petitioner is not entitled to relief.

*Jennings II*, at *16.

Petitioner has not established that this was an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence presented. At the post-conviction hearing, Petitioner questioned his counsel regarding her failure to object to the prosecution's questions regarding Mr. Robinson's reprimand [Doc. 6-31 at 32–33], and his counsel admitted on cross-examination that she was unsure whether she knew at trial that Mr. Robinson had shot himself in the hand during an analysis [*Id.* at 60–61]. But counsel also testified that she knew of certain issues in Mr. Robinson's history, that Mr. Robinson carried paperwork to explain those issues, and that she visited the scene with Mr. Robinson in preparation for trial [*Id.* at 60]. Counsel's lack of memory regarding whether she was aware at the time of trial that Mr. Robinson had shot himself in the hand during an analysis is not evidence that her investigation of Mr. Robinson was insufficient, and Petitioner points to no evidence establishing that his counsel's investigation of Mr. Robinson was insufficient.

40

Moreover, as the TCCA pointed out, Petitioner has never presented evidence that another expert without Mr. Robinson's employment issues was available and willing to provide testimony favorable to Petitioner at trial. *See, e.g., Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006) (finding that the state courts' conclusion that a petitioner had failed to present proper evidence of what a witness's testimony would have been if he testified "was not contrary to or an unreasonable application of clearly established law").

Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

## IV.    CONCLUSION

For the reasons set forth above, the petition for § 2254 relief [Doc. 1] will be **DENIED**, and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right and thus a COA should issue. *See Miller-El*, 537 U.S. at 327, 336; *Slack*, 529 U.S. at 484.

Reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right with regard to his claims challenging the sufficiency of the evidence, alleging prosecutorial misconduct, or alleging ineffective assistance of counsel, such that they would be adequate to deserve further review.  Accordingly, a **COA SHALL NOT ISSUE.**  Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous.  Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE